# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ~~MATTHEW ANDERSON, and~~ SHAWN DOLIFKA, individually and on behalf of all other persons similarly situated,<br><br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br>TETHER HOLDINGS LIMITED, TETHER LIMITED, TETHER INTERNATIONAL LIMITED, TETHER OPERATIONS LIMITED, IFINEX INC., BFXNA INC., and BFXWW INC.,<br><br><div align="center">Defendants.</div> | Case No. 21-CV-10613-LTS<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

~~Plaintiffs Matthew Anderson, and~~ Plaintiff Shawn Dolifka

(~~together, "Plaintiffs~~ "Plaintiff") individually and on behalf of all others similarly situated,

complain upon knowledge as to their own acts and upon information and belief as to all other

matters against Tether Holdings Limited, Tether Limited, Tether International Limited, Tether

Operations Limited,[1] iFinex Inc., BFXNA Inc., and BFXWW Inc.[2] (collectively "Defendants")

as follows:

<div align="center"><u>INTRODUCTION</u></div>

1.      This case arises from Defendants' scheme to induce consumers to purchase its

cryptocurrency, Tether ("Tether tokens").

2.      Since its creation, Defendants have marketed Tether tokens as a "stablecoin" i.e.,

---

[1] "Tether" as used in this Complaint refers to Tether Holdings Limited, Tether Limited, Tether International Limited, and Tether Operations Limited.

[2] "Bitfinex" as used in this Complaint refers to iFinex, Inc, BFXNA Inc., and BFXWW Inc.

<div align="center">1</div>

-a cryptocurrency that is tied to a real-world currency. Defendants represent that Tether tokens are purportedly "pegged" to the U.S. dollar.

2.3.     As a stablecoin pegged to the U.S. dollar, Tether's price should stay constant. Indeed, consumers value digital currency pegged to the U.S. dollar for its low risk, relatively high stability, and high interest rates, among other features, all of which arise out of the fact that it is a dollar-backed coin.

3.4.     3.Yet Defendants have consistently maintained on their website, blog posts, court filings, social media accounts, and elsewhere that Tether tokens are backed one-to-one by sufficient reserves in U.S. dollars. Defendants have also promised, in the interest of transparency, to undergo routine audits of Tether's reserves.

4.5.     4.Given these representations, consumers, including PlaintiffsPlaintiff, reasonably believed that each Tether token was equal to one U.S. dollar and backed by one U.S. dollar in Defendants' reserves.

5.6.     5. But these representations were false. Two regulatory agencies, the New York State Attorney General ("NYOAG") and the Commodities Futures Trading Commission ("CFTC"), found that Defendants had misrepresented the backing of Tether tokens and in fact, Defendants did not maintain the same amount of reserves as Tether tokens in circulation. At times, Defendants had no reserves whatsoever. Further, these reserves did not contain U.S. dollars, as Tether suggested, but were a mix of other assets, such as overcollateralized loans and other undisclosed commercial paper.

6.7.     6.To dateAs of 2021, Tether maintainsmaintained less than  4% in cash reservesand has yet to undergo a single professional audit. In 2022, a report from BDO confirmed that Tether still only maintained $5, 418, 232, 067 in cash and bank

deposits, even though there are more than 70 billion Tether tokens in circulation at that time.

7.8.   7.Thus, while Defendants claim to be "transparent," they have uniformly misled consumers regarding the attributes of Tether tokens, the sufficiency of Tether's reserves, and what those reserves contain.

8.9.   8.Had consumers, including PlaintiffsPlaintiff and Class members, known that these representations were false they would not have purchased Tether tokens or would have been unwilling to pay the price at which they purchased Tether tokens.

## PARTIES

### A.   Plaintiffs

A.   9. PlaintiffMatt Anderson is a resident of Suffolk County, New York.10. Plaintiff Anderson first purchased Tether tokens in 2017 on the Bittrex cryptocurrency exchange. Since then, he has made several other purchases of Tether tokens on other cryptocurrency exchanges, including KuCoin and Cryptopia.11.   For example, Plaintiff Anderson purchased Tether tokens on KuCoin on October 14, 2021, October 18, 2021, and October 24, 2021.12.  As a result of Defendants'misrepresentations and omissions, Plaintiff Anderson believed that Tether tokens were a stablecoin backed one-to-one with the U.S. dollar.13.   Had Plaintiff Anderson known that Tether tokens were not truly a stablecoin nor backed one-to-one with the U.S. dollar, he would not have purchased, or would have paid substantially less, for Tether tokens.

9.10.   14.Plaintiff **Shawn Dolifka** is a resident of Bexar County, Texas.

10.11.   15.Plaintiff Dolifka first purchased Tether tokens in August of 2021 on the Coinbase Procryptocurrency exchange. Since then, he has made several other purchases of Tether tokens on other cryptocurrency exchanges, including MEXC.

3

11.12.  Plaintiff Dolifka also purchased Tether tokens on MEXC on September 23, 2021, September 24, 2021, and October 1, 2021 for a value of approximately $1.00 per token.

12.13.  Plaintiff Dolifka purchased Tether tokens on the Coinbase Pro cryptocurrency exchange on October 6, 2021 for a value of approximately $1.00 per token.

13.14.  17.As a result of Defendants misrepresentations and omissions, Plaintiff Dolifka believed that Tether tokens were a stablecoin backed one-to-one with the U.S. dollar.

14.15.  18.Had Plaintiff Dolifka known that Tether tokens were not truly a stablecoin nor backed one-to-one with the U.S. dollar, he would not have purchased, or would have paid substantially less, for Tether tokens.

**B.    Defendants**

**a.  Tether**

15.16.  19.**Tether Holdings Limited** is an entity organized under the laws of the British Virgin Islands. Tether Holdings Limited is the holding company for Tether Limited, Tether Operations Limited, and Tether International Limited.

16.17.  20.**Tether Operations Limited** is an entity organized under the laws of the British Virgin Islands. Tether Operations Limited operates Tether's website and token platform, tether.to, to store, send, and make purchases of Tether tokens.

17.18.  21.**Tether International Limited** is a corporation organized under the laws of the British Virgin Islands.

18.19.  22.**Tether Limited** is an entity organized under the laws of Hong Kong. Tether Limited is responsible for creating and redeeming tokens as well as maintaining the one-to-one deposit backing for Tether tokens. Tether Limited also operated Tether's website and token

platform, tether.to, to store, send, and make purchases of Tether tokens between September 8, 2017 and March 15, 2017.

19.20.  23.Tether began selling Tether tokens, including to customers in New York and the United States, since at least January 1, 2015.

20.21.  24.While Tether claims to have banned New York and United States customers from purchasing Tether tokens in November 2017, this is false.

21.22.  25.Only in November 2018 did Tether update its Terms of Service to prohibit New York and United States customers. But even after that time, Tether continued to sell Tether tokens to individuals located in New York and the United States. Indeed, Plaintiffs werePlaintiff was able to purchase Tether tokens after this time.

22.23.  26.According to an investigation by the New York Attorney GeneralNYOAG, Tether continued to sell significant amounts of Tether tokens to New York individuals through at least late 2019. In fact, in 2019, Tether entered into a written agreement to loan Tether tokens to a New York-based firm.

23.24.  27.Further, Tether continues to facilitate the purchase of Tether tokens in New York to New York-based individuals by allowing Tether tokens to be purchased on cryptocurrency exchanges other than Bitfinex.

24.25.  28.For example, Tether is available for purchase on the Poloniex cryptocurrency platform, which is owned and operated by Circle Internet Financial, an entity licensed by the New York Department of Financial Services.

25.26.  29.Until April 2019, Tether tokens were available for purchase on Bittrex cryptocurrency platform, including by individuals in New York.

26.27.  30.Further, as alleged above, Plaintiff Anderson, a New York individual, purchased Tether tokens on KuCoin on October 14, 2021, October 18, 2021, and October 24, 2021.

27.28.  31.As these examples demonstrate, Tether purposefully and routinely operated in New York and permitted individuals in New York to purchase Tether tokens.

### b. Bitfinex

28.29.  32.**iFinex, Inc.** is a corporation organized under the laws of the British Virgin Islands. iFinex owns, operates, and controls the Bitfinex cryptocurrency platform.[3]

29.30.  33.**BFXNA Inc.** is a corporation organized under the laws of the British Virgin Islands. BFXNA Inc. maintains its principal place of business in Hong Kong, China.  BFNXA Inc. is a wholly-owned subsidiary of iFinex, Inc.

30.31.  34.**BFXWW Inc.** is a corporation organized under the laws of the British Virgin Islands. BFXWW Inc. is a wholly-owned subsidiary of iFinex, Inc.

31.32.  35.Since at least January 1, 2015, Bitfinex operated in, and permitted customers from, New York to use its cryptocurrency platform.

32.33.  36.While Bitfinex claims to have banned New York customers from transacting on the platform through a provision in its Terms of Service in January of 2017, based on documents obtained by the New York Attorney GeneralNYOAG, Bitfinex continued to permit New York customers to access its website and use the Bitfinex platform.

---

[3] There is substantial overlap in leadership, operation, and control between Bitfinex and Tether. Bitfinex's top executives, Giancarlo Devasini and Philip Potter, are beneficial owners of Tether. Ludovicus Jan Van Der Velde is the CEO of both Tether and Bitfinex. Samuel Haig, *Paradise Papers Reveal Bitfinex's Devasini and Potter Established Tether Already Back in 2014,* BITCOIN.COM, (Nov. 23, 2017) https://news.bitcoin.com/paradise-papers-reveal-bitfinexs-devasini-and-potter-established-tether-already-back-in-2014/.

33.34. 37.For example, in October 2018, Bitfinex "onboarded" a virtual currency firm located in New York, as well as its associated entities, to use the Bitfinex platform.

34.35. 38.Likewise, documents uncovered by the New York Attorney GeneralNYOAG demonstrate that Bitfinex knew and permitted New York-based individuals to use its platform to trade Tether tokens through at least early 2019.

35.36. 39.In April 2019, Bitfinex "verified" another individual to use its platform that it knew resided in, and used the platform from, New York. For Bitfinex to "verify" an individual, the individual must submit personally identifying personal information, which is reviewed by Bitfinex. According to the New York Attorney GeneralNYOAG, Bitfinex verified a "significant number" of New York residents between 2015 and at least 2019.

36.37. 40.Further, on March 12, 2018, a Bitfinex manager reminded the entire customer team that customers did not need to be verified to "deposit/withdraw cryptocurrencies and trade fully (including USD pairs" and that "there are no limits to this." Further, the manager explained that customers could "buy/sell . . . whatever from another site and transfer it here." This demonstrates that customers, including those in New York, could entirely bypass the purported limitation contained in the Terms of Service.[4] If an employee did encounter a U.S. person, they were instructed not to include them on a "worksheet" used to track customer verification requests.

37.38. 41.Bitfinex customer service representatives also encouraged U.S. customers to circumvent its Terms of Service by using a VPN connection to mask the customer's IP address

---

[4] Indeed, the CFTC made this exact finding in its order against Bitfinex finding "Bitfinex customers, including those in the U.S., could click through and simply ignore the TOS and continue to access the Bitfinex platform."

and hide their true location so as to make it appear as though they were in a location where trading was authorized.

38.39.  42.As these examples demonstrate, Bitfinex purposefully and routinely operated in New York and allowed New York-based individuals to access its website and use its platform throughout the Class Period.[5]

39.40.  43.Defendants have other substantial contacts with New York as well. For instance, according to NYOAG investigation from 2014 through at least 2018, one of Defendants' most senior executive, and largest shareholders, resided in and conducted business on their behalf within New York, including with customers who appeared to be New-York based.

40.41.  44.Defendants also purposefully established relationships with New York financial institutions to facilitate the operation of the Bitfinex platform and the sale of Tether tokens.

41.42.  45.According to the New York Attorney GeneralNYOAG, in December 2017, Defendants opened bank accounts at the New York-based financial institution Metropolitan Commercial Bank. Transactions at Metropolitan Commercial Bank were facilitated by a senior executive of Defendants located in New York.

42.43.  46.In February 2018, Defendants opened bank accounts at the New York-based financial institution Signature Bank. Transactions at Signature Bank were facilitated by a senior executive of Defendants located in New York.

---

[5] Bitfinex also continues to offer at least two tokens other than Tether on its Bitfinex platform that are issued by New York virtual currency companies.

43.44.   47.Between June 2017 and October 2018, Defendants' senior executive located in New York facilitated Defendants' transactions with Noble Markets LLC ("Noble"), based in New York. Bitfinex opened a bank account at Noble Bank International, a Puerto Rican-based entity and a subsidiary of New York-based Noble Markets LLC, in June 2017. Bitfinex's Noble Bank account received U.S. dollar deposits from two institutional trading firms, one of which was located in New York. In September of 2017, Tether opened a bank account with Noble Bank, at which time Bitfinex transferred $385,446,847.71 into Tether's account.

44.45.   48.In 2017, Defendants entered into multiple "sponsored pool agreements" with Noble and virtual currency firms to settle virtual currency transactions in U.S. dollars. These agreements contained a New York choice of venue provision.

45.46.   49.Defendants also engaged with several New York entities for the express purpose of continuing their misrepresentations that Tether tokens were a stablecoin backed one-to-one with the U.S. dollar.

46.47.   50.Specifically, in 2017, Defendants engaged Friedman LLP, with offices in New York, to review Tether cash reserves held at Noble Bank. According to the New York Attorney GeneralNYOAG, part of this engagement took place in New York. Defendants published the results of Friedman LLP's review, which were available to New York residents and New York Tether token purchasers.

47.48.   51.In 2018, Defendants engaged Freeh Sporkin & Sullivan LLP, a law firm with offices in New York, to review its Tether cash reserves. Defendants published the results of Freeh Sporkin & Sullivan LLP's review, which were available to New York residents and New York Tether token purchasers.

48.49.   52.In 2017, Defendants engaged 5W Public Relations, a New York-based firm located at 230 Park Avenue, New York, NY 10169, to be its "PR Agency of Record." The purpose of this engagement was to, among other things, make public statements on Defendants' behalf regarding the Bitfinex platform and, specifically, Defendants' cash-backing of Tether tokens. For example, in response to a tweet about Defendants' lack of transparency, 5W Public Relations CEO tweeted, "We plan to release regular financial statements and are working with journalists who can review our finances as wel [sic]." In furtherance of this engagement, Defendants' general counsel proposed an in-person meeting in New York City in November 2017.

**<u>FIGURE 1</u>**



**<u>JURISDICTION AND VENUE</u>**

49.50.   53.This Court has subject matter~~jurisdiction over this action pursuant to 28 U.S.C.~~ ~~§ 1332(a) because the amount in controversy in this case exceeds $75,000 as the Plaintiffs~~ ~~collectively purchased more than $75,000 in Tether tokens and this action is between citizens of~~

different states.54.      This Court also has jurisdiction over this action pursuant to the Class

Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of

diverse citizenship from one Defendant, there are more than 100 Class members, and the

aggregate amount in controversy exceeds $5 million, exclusive of interest and costs. Given the

estimated size of the class (*i.e.*, approximately millions of individuals), statutory damages

available to PlaintiffsPlaintiff and Class members under New York Gen. Bus. Law § 350 far

exceed the $5 million threshold as there are more than $76,502,325,882.13 of Tether tokens in

circulation that were fraudulently marketed. As does the likely value of any injunctive relief.

50.51.  55.This Court has personal jurisdiction over each Defendant because, as described

above (*see* ¶¶ 23, 26-52) each Defendant transacted business in and maintained substantial

contacts in this District. Defendants' conduct was intentionally directed at, and had the effect of,

causing injury to persons residing in this District.

51.52.  56.Venue is proper in this District under 28 U.S.C. § 1391(b) because a

substantial part of the events, acts, and omissions giving rise to PlaintiffsPlaintiff's claims

occurred in this District.

**FACTUAL ALLEGATIONS**

A.      **The Rise of Cryptocurrency**

52.53.  57.Cryptocurrencies are widely considered to be the future of finance.

Cryptocurrency is digital money based on blockchain technology. The first cryptocurrency,

Bitcoin, was created in 2009 and has continued to steadily rise in both popularity and value.

Since Bitcoin's creation, there have been more than 5,000 different cryptocurrencies in

circulation.  As of February 2021, more than 100 million people around the world are purchasing

cryptocurrency. By 2023, over 400 million people worldwide owned cryptocurrency.

Cryptocurrency is largely unregulated and is subject to governance and oversight only by their respective creators and users.

53.54.   58.Cryptocurrency is decentralized, meaning there is no central authority, such as a bank or government, who manages and maintains its value. Unlike traditional paper money, cryptocurrency has no physical form. Rather, it is a set of data secured by cryptography that is encoded and later decoded back to its original form by the end-user. The cryptography comes in the form of transactions that are verified and recorded in a blockchain program.

54.55.   59.A blockchain is an open online ledger and transaction log used to create digital records of cryptocurrency transactions, certificates, or contracts. Each user of a cryptocurrency has their own copy of the blockchain, creating a unified transaction record. The blockchain records each new transaction in real time and updates every copy of the blockchain simultaneously with the new information. The transactions are recorded in "blocks" that are linked together on a "chain" of previous cryptocurrency transactions.

55.56.   60.All cryptocurrency transactions are validated for authenticity prior to being added to the blockchain. The transactions are verified by individual users and each verified transaction must be checked and approved by the majority of ledger holders.

56.57.   61.Because cryptocurrency has no physical form, purchasers of cryptocurrency store their cryptocurrency in a digital "wallet," which acts similar to a traditional bank account. These wallets are digital addresses with private and public keys that enable users to send and receive cryptocurrency. The private keys allow cryptocurrency to be unlocked and sent, and the public keys enable the holder to receive cryptocurrency from any sender. If the user does not have the proper keys, the network will reject the transaction.

~~57.~~58.  ~~62.~~Cryptocurrency is purchased on peer-to-peer networks and cryptocurrency exchanges, such as Bitfinex. These exchanges are platforms where buyers and sellers meet to exchange cryptocurrencies. Some platforms allow users to purchase cryptocurrency with fiat currency, while others only allow users to purchase cryptocurrency using another cryptocurrency. Most cryptocurrency exchanges are not backed by the same protections as banks, like the Federal Deposit Insurance Corp. ("FDIC").

~~58.~~59.  ~~63.~~Some cryptocurrencies are also sold at popular retailers, such as at Walmart, Safeway, Albertsons, 7-Eleven, Rite Aid, and CVS. More than 20,000 retail locations sell cryptocurrency, including 200 Walmart stores.

~~59.~~60.  ~~64.~~There are various categories of cryptocurrencies. Tether tokens are a "stablecoin/ digital fiat," a cryptocurrency that attaches its value to a government-backed currency on the blockchain which has a fixed worth on cryptocurrency exchanges. Stablecoins are intended to track the value of the fiat currency that backs it.

~~60.~~61.  ~~65.~~Stablecoins like Tether tokens are attractive to consumers because, unlike most cryptocurrencies, they do not suffer from extreme volatility. Since they track currencies like the U.S. dollar, the prices of stablecoins like Tether tokens are intended to remain mostly stable. While extreme price fluctuations can result in high returns, they are also high risk. Thus, consumers of stablecoin enjoy the benefits of cryptocurrency without risking extreme volatility. In other words, stablecoins offer less risk.

~~61.~~62.  Due to their relative price stability, stablecoins are also a desirable medium for lending and transferring money.Consumers can ~~also~~therefore earn money on stablecoins by holding them for the long term or lending their tokens to borrowers and collecting interest. In fact, stablecoin investments generate much higher interest rates—more than 20% in some

cases—than traditional accounts. Tether in particular generates higher interest rates than other cryptocurrencies, including Bitcoin.

~~62.~~63.   Dollar-backed stablecoins in particular are uniquely valuable to consumers. For example, cryptocurrency asset-backed stablecoins, which are backed by other cryptocurrencies, are not as stable as dollar-backed coins and share the same vulnerabilities as the backup cryptocurrency. Similarly, non-collateralized stablecoins, which are backed by price-regulating algorithms, run a higher risk of security breaches.

~~63.~~64.   The unique value of a stablecoin like Tether comes from its stability. Its  stability is derived from the promise that the issuing entity will maintain sufficient reserves and only issue new coins commensurate with deposits in the reserves.  Based on Tether's misleading representations, a consumer will therefore be willing to purchase Tether for $1.00 instead of other cheaper cryptocurrency in order to benefit from Tether's purported stability.

~~64.~~65.   But without that value, other coins are available for cheaper. For example, on September 23, 2021, one of the days that Plaintiff Dolifka purchased his Tether tokens, Dogecoin and Ripple, both non-stablecoins, were available for purchase at less than $1.00 ($0.22 and $0.98, respectively).

### B.   Bitfinex & Tether

~~65.~~66.   ~~66.~~Bitfinex is a cryptocurrency exchange founded in 2012. Bitfinex offers a variety of services for the purchase of cryptocurrency, including the Tether token. Bitfinex also serves as a digital wallet, allowing users to store their cryptocurrency and facilitating transfers to different exchange platforms. Bitfinex permits users to deposit cryptocurrency and fiat currency, such as U.S. dollars, into their accounts in order to purchase cryptocurrencies. Bitfinex also

facilitates the conversion of cryptocurrency back into fiat currency for the user to withdraw their funds.

66.67.   67.Tether tokens were originally dubbed "Realcoins" and were created by Brock Pierce at a Santa Monica-based startup in 2014. Realcoin was set to be a digital currency that was backed one-to-one by fully auditable reserve of dollars. Realcoin's Chief Executive Officer, Reeve Collins, stated at the time that the company would maintain a real-time record of its dollar-based reserves.

67.68.   68.As a stablecoin designed to maintain constant value and avoid the price volatility of other cryptocurrencies, andwhich thereby enablingenables users to "transact with fiat currencies across exchanges[,]" Tether tokens are not a security or investment. Rather, Tether tokens sit in a consumer's digital wallet or virtual account at Bitfinex or another exchange waiting to be consumed or used.

68.69.   69.Shortly after this announcement, Realcoin rebranded as Tether tokens to avoid confusion with "altcoins." Mr. Collins explained the rebranding "We're not an altcoin, we're not our own blockchain. We're a service, a token that represents dollars. Our [specialty] at Tether is currencies on the blockchain, so Tether means a digital tie to a real-world asset and the digital assets that we're focused on is currencies."

**FIGURE 2**



69.70.   70.Mr. Collins explained that Tether tokens were "purely digital dollars" that are "just representing dollars, in our bank account." There was no complex formula to Tether tokens, and, according to Mr. Collins, the number of Tether tokens in circulation would always equate to the dollars Defendants' bank.

70.71.   71.Tether's website confirmed the same, stating that Tether tokens were "100% Backed" and that "[e]very tether is always backed 1-to-1, by traditional currency held in our reserves. So 1 USD[T] is always equivalent to 1USD."

**FIGURE 3**



100% Backed

Every tether is always backed 1-to-1, by traditional currency held in our reserves. So 1 USD₮ is always equivalent to 1 USD.

---

71.72.   72.In January of 2015, Bitfinex announced that Tether tokens would be integrated with its platform to enable verified Bitfinex users to fund their accounts and withdraw U.S. dollar balances directly and securely without using traditional financial institutions. By May of 2015, there were more than 450,000 Tether tokens in circulation.

72.73.   73.Since then, Tether tokens have sincegrown into the third largest cryptocurrency in the world based on market valueand currently has more than, with a total market capitalization value of over $6082  billionworth of Tether tokens in circulation. Tether tokens are the most popular stablecoin and Tether is the most traded cryptocurrency by volume, often doubling that of Bitcoin. As of 2022, Tether tokens arewere listed on several dozen cryptocurrency exchange platformsover 400 exchanges around the world, including Bitfinex.

16

### C.     Tether Consistently Represented Tether Tokens Were Backed 1:1 by U.S. Dollars

73.74.   74. Tether has a history of failing to disclose its relationships. In 2017, documents were leaked that revealed Bitfinex's chief executive officer, Ludovicus Jan Van Der Velde, was also the chief executive officer and director of Tether, and Bitfinex's chief financial officer, Giancarlo Devasini was a director and shareholder of Tether. Similarly, Tether only announced its banking partners in 2018, after rumors began to circulate about its solvency.

74.75.   75. But the biggest controversy is Tether's claim that it always held one-to-one reserves in U.S. dollars for all its authorized, issued, and sold Tether tokens and that each Tether token is backed by its corresponding currency.

75.76.   76. As stated above, since its inception Tether has claimed that Tether tokens were "purely digital dollars" that are "just representing dollars, in our bank account." In addition to claiming that Tether tokens are backed 1-to-1 by U.S. dollars, Tether has also consistently promised to undergo routine, professional audits to confirm its representations.

76.77.   77. Tether confirmed the same on its website, stating that Tether tokens were "digital money" and that "Every tether is always backed 1-to-1, by traditional currency held in our reserves. So 1 USD[T] is always equivalent to 1 USD." Tether also claimed its "reserve holdings" were published daily and "subject to frequent professional audits," confirming "All tethers in circulation always match [its] reserves."

**FIGURE 4**



### 100% Backed

Every tether is always backed 1-to-1, by traditional currency held in our reserves. So 1 USDŦ is always equivalent to 1 USD.



### Transparent

Our reserve holdings are published daily and subject to frequent professional audits. All tethers in circulation always match our reserves.

---

77.78.   78.Tether's Twitter account made the same representations, claiming that each Tether token "represents dollars."

78.79.   79.Tether repeated these sentiments in a whitepaper titled "Tether: Fiat Currencies on the Bitcoin blockchain" Tether represented:

> Tether's Proof of Reserves configuration is novel because it simplifies the process of proving that the total number of tethers in circulation (liabilities) *are always fully backed by an equal amount of fiat currency held in reserve (assets).* In our configuration, each tetherUSD in circulation represents one US dollar held in our reserves (i.e. a one to one ratio) which means the system is fully reserved when the sum of all tethers in existence (at any point in time) is exactly equal to the balance of USD held in our reserve. Since tethers live on the Bitcoin blockchain, the provability and accounting of tethers at any given point in time is trivial. Conversely, the corresponding total amount of USD held in our reserves is proved by publishing the bank balance and undergoing periodic audits by professionals

79.80.   80.Tether would make these same representations in blog posts, interviews, and public court filings. For instance, in April 2017, in a federal lawsuit filed by Tether Limited, iFinex and Bitfinex, they represented that "Tether is a digital token and each Tether unit issued into circulation is backed one-to-one by the U.S. Dollar, i.e., customer dollars held by Tether." *See iFinex v. Wells Fargo*, Case No. 3:17-cv-01882 (N.D. Cal. Apr. 5, 2017). Given these

constituent representations, it became public knowledge that Tether tokens were purportedly backed 1-to-1 by U.S. dollars in reserves.

### D.    Defendants knowingly Mislead Consumers

~~80.~~81.   ~~81.~~Each of these representations were false. According to the New York Office of the Attorney General, ("NYOAG"), prior to 2017, Defendants utilized several Taiwan-based banks to send and receive wire transfers to fulfill customer orders for U.S. dollars. Defendants used Wells Fargo to execute these wire transfers, but Wells Fargo discontinued this arrangement in March 2017.

~~81.~~82.   ~~82.~~At the time Wells Fargo discontinued this arrangement, 50 million Tether tokens were issued and in circulation. By May 31, 2017, this number had doubled to more than 108 million Tether tokens. Between June 1, 2017 and September 15, 2017, this number rose to 442 million Tether tokens.

~~82.~~83.   ~~83.~~Tether did not have any significant banking relationships between March 2017 and September 15, 2017. The only relevant entity that did was Bitfinex, who opened an account with Noble Bank International, a subsidiary of New York-based Noble Markets LLC, in June of 2017. Significantly, between June 1, 2017 and September 15, 2017, Bitfinex's Noble account received USD deposits from only two institutional trading firms, one located in New York, neither of which purchased Tether tokens directly from Defendants.

~~83.~~84.   ~~84.~~Between June 1, 2017 and September 15, 2017, Bitfinex held approximately $382 million of Tether's funds in a comingled account. These funds should have been held by Tether to back the Tether tokens in circulation but were not. Tether accounted for this money as a "receivable" from Bitfinex.

19

84.85.  85.The only account tangentially related to Tether was a trust account at the Bank of Montreal in the name of Tether's General Counsel. This account never had more than $61.5 million in deposits, equivalent to nearlyless than half of Tether tokens in circulation on May 31, 2017 and less than a quarter of the approximate 442 million in circulation as of September 15, 2017.

85.86.  86.In May 2017, Defendants promised to conduct a "comprehensive balance sheet audit" by June 30, 2017. Defendants noted that "[a] third-party audit is important to all Bitfinex stakeholders" and that this process would "cement[] customer and shareholder confidence." Defendants retained U.S.-based firm Friedman LLP, an accounting and advisory services firm, to complete audits of both Tether and Bitfinex. These audits were never completedTether, however, did not release its BDO report until 2022. That  report confirmed that Tether's assets still were a mix of commercial paper, money market funds, reverse repurchase agreements, and some cash, which still did not cover the amount of Tether tokens in circulation.

86.87.  87.Shortly thereafter, reports began to circulate that Defendants did not have sufficient cash backing to support the increasing number of Tether tokens in circulation. Defendants stated that the "outlandish conspiracy theories suggesting that Tether is not backed 1:1 by currency on deposit with bank institutions" were "unequivocally false, and the audits will bear that out."

87.88.  88.In an attempt to address these concerns, Defendants requested that Friedman LLP conduct a verification of its cash backings, despite the fact that Tether did not have a bank account at the time. The parties agreed that Friedman LLP would conduct its verification on September 15, 2017.

88.89.   89.On the morning of September 15, 2017, Tether opened a bank account at Noble Bank and Bitfinex transferred approximately $382 million from its bank account to Tether's.

89.90.   90.Friedman LLP compared Defendants' own documentation that it provided to Friedman LLP to the "Omni Layer Protocol," which is a software that allows for the issuance and redemption of tokens like Tether tokens. Friedman LLP utilized the Omniexplorer.info website, which is a block explorer that displays Tether token balances and transaction data to trace the balances on the website to Defendants' own documentation. However, Friedman LLP disclaimed that it did not perform any "procedures around the parameters or completeness/accuracy of the Omni Layer Protocol or the Omniexplorer.info website during [its] examination."

90.91.   91.Using this website, Friedman LLP analyzed what it refers to as a "creation address." Defendants represented to Friedman LLP that this address was "controlled by" Defendants and was "inclusive of all Tether tokens issued." Based on its review of this account, Friedman LLP reported that the total number of Tether tokens in circulation was 444,951,600.

91.92.   92.With respect to cash balances, Friedman LLP indicated that Defendants held $442,984,592 as of September 15, 2017, in various bank accounts—at least one of which was maintained "for the benefit of Tether Limited" i.e., the trust account of its General Counsel. A majority of these funds, i.e., $382 million, were the funds deposited from Bitfinex that same day.

21

**FIGURE 5**

1)

| Bank | Currency | Cash reserves per Client's trial balance as of September 15, 2017 | Cash per bank balance as of September 15, 2017 | For the benefit of |
|---|---|---|---|---|
| ███████████ | USD | $60,919,810 | $60,919,810 | ███████████ for the benefit of Tether Limited |
| ███████████ | USD | $382,064,782 | $382,064,782 | Tether Limited |
| | EUR | €1,590 | €1,590 | Tether Limited |

2)

| | For the period October 6, 2014 through September 15, 2017 8:00 PM EDT | | |
|---|---|---|---|
| Token | Tether tokens issued and outstanding per the tether.to transparency website (a) | Tether tokens per Client's trial balance | Tether tokens per Omniexplorer.info website (b) |
| USDT | 442,481,760 | 442,481,760 | 442,481,760 |
| EURT | 1,444 | 1,444 | 1,444 |

~~92.~~93.    ~~93.~~Friedman LLP expressly stated that it could not make any representations about "the Client's ability to access funds from the accounts or whether the funds are committed for purposes other than Tether token redemptions."

~~93.~~94.    ~~94.~~Defendants then published Friedman LLP's findings on its website and Twitter account on September 30, 2017, claiming that it has "[a]lways full reserves."

**FIGURE 6**



94.95.   95.Defendants further stated on their websites that the report was a "good faith effort on [its] behalf to provide an interim analysis of [its] cash position and [its] issued and outstanding tokens, as part of [its] ongoing efforts to further professionalize the transparency mechanisms of Tether Limited."

95.96.   96.The NYOAG found that these representations were misleading, as Tether tokens were not backed 1-to-1 by U.S. dollars between at lastleast June 1, 2017 and September 15, 2017. It explained "[n]o one reviewing Tether's representations would have reasonably understood that the $382,064,782 listed as cash reserves for tethers had only been placed in Tether's account as of the very morning that Friedman verified the bank balance."

96.97.   97.In October 2017, according to the CFTC, Defendants held at least twelve accounts with unlicensed money transmitting business in Panama called Crypto Capital Corp. These accounts were commingled to hold funds relating to Bitfinex customer transactions and Tether token issuances. In August 2018, these accounts also commingled Tether token reserves. There were no agreements governing the handling of these accounts, and, according to the CFTC, Defendants "did not receive or have access to all period account statements issued" and, instead "maintained an internal ledger of the funds they believed were held in those accounts."

97.98.   98.Between October 2017 and November 2018, Defendants instructed customers to wire payment to these accounts. In the beginning of 2018, $480 million were deposited in these accounts. Around the same time, Defendants encountered serious issues with withdrawing these funds, but continued to use these accounts. At one point Defendants stated "over 80% of our money is now with you," and "we have too much money with you and almost nothing elsewhere."

98.99.   99.During the summer of 2018, Bitfinex borrowed $400 million from Tether to address what Bitfinex characterized as a "temporary liquidity crisis." Between August 21, 2018 and September 2018, Tether made four cash transfers to Bitfinex. In October 2018, Bitfinex redeemed 400 million Tether tokens to repay its debt. These transactions were never disclosed to consumers.

99.100.           100.In June 2018, Defendants retained the law firm of Freeh, Sporkin & Sullivan LLP ("FSS") to review bank accounts purportedly "owned or controlled by Tether" and other documentation. FSS received from these respective banks notarized statements stating that as of June 1, 2018 these accounts held $2.5 billion in USD. It then had Defendants' Chief Financial Officer and General Counsel certify that on the same date, there were 2.5 billion Tether tokens in circulation. Notably, FSS is not an accounting firm, FSS "did not perform the above review and confirmation using Generally Accepted Accounting Principles," did not conduct "an audit," and made no "conclusions as to Tether's compliance with applicable laws and regulations in any jurisdiction."

100.101.           101.Defendants published FSS' findings on its website and Twitter account on June 20, 2018, claiming that it was a "transparency update."

**FIGURE 7**



101.102.        102.Defendants further stated on their website that they released this

report to counter the "speculation and negative reporting" regarding Tether which it claims arose

from a "misunderstanding of how Tether functions." Defendants, yet again, "stood by the fact

that all circulating USD Tethers are backed by [its] reserves" and that FSS's report was

"independent verification of this."

102.103.        103.Defendants stated unequivocally that "[a]ll Tethers in circulation are

fully backed by USD reserves. Full stop. Memoranda, consulting reports, industry leaders,

cryptocurrency pioneers, and competitors have all confirmed this."

103.104.        104.In 2018, more rumors emerged that Tether tokes were not backed by

U.S. dollars on a one-to-one basis. Charles Hayter, the chief executive of CryptoCompare, told

CNBC that "[t]here is concern about tether and whether it is truly backed by dollars and rumors

about USDT (tether) being delisted from various exchanges." Around the same time, the value of

Tether tokens dropped below one dollar.

~~104.~~105.        ~~105.~~On November 1, 2018, Tether publicly announced that it had

established a relationship with Deltec Bank & Trust Limited ("Deltec") in the Bahamas. Tether

again represented that "USDT in the market are fully backed by US dollars that are safely

deposited in our bank accounts."

~~105.~~106.        ~~106.~~The announcement was accompanied by a letter from Deltec stating

that "the portfolio" held approximately $1.8 billion in "cash value."

**FIGURE 8**

Dear Sirs:

We hereby confirm that, at the close of business on October 31, 2018, the portfolio cash value of your account with our bank was US$1,831,322,828.

This letter is provided without any liability, however arising, on the part of Deltec Bank & Trust Limited, its officers, directors, employees and shareholders, and is solely based on the information currently in our possession.

~~106.~~107.        ~~107.~~Tether posted the announcement to its Twitter account, stating

"Balance confirmation at 2018-10-31 attached."

**FIGURE 9**



Tether ✔ @Tether_to · Nov 1, 2018
We are pleased to be able to confirm that Tether has an account with Deltec Bank & Trust Limited tether.to/tether-banking... . Balance confirmation at 2018-10-31 attached.

tether.to
Tether Banking Relationship Announced | Tether
Tether Limited is pleased to confirm that it has established a banking relationship with Deltec Ban...

💬 129          🔁 479          ♡ 1K

~~107.~~108.        ~~108.~~The very next day, Tether made the first of five transfers totaling $475

million to a Bitfinex account. Bitfinex also purported to "purchase" 150 million Tether tokens by

transferring $150 million in funds to a Tether account. Neither of these transactions were disclosed. To date, only a quarter of Tether's funds are held with Deltec.

~~108.~~109.        ~~109.~~When asked why money moved between Bitfinex and Tether accounts by reporters at The Verge, a Tether spokesperson declined to comment and stated that "Tether and Bitfinex are two different business and groups with two different objectives."

~~109.~~110.        ~~110.~~In late February 2019, Tether updated its website to change its representations regarding its reserves. This change was not announced.

**FIGURE 10**



## 100% Backed

Every Tether token is always 100% backed by our reserves, which include traditional currency and cash equivalents and, from time to time, may include other assets and receivables from loans made by Tether to third parties, which may include affiliated entities (collectively, "reserves"). Every Tether token is also 1-to-1 pegged to the dollar, so 1 USDT Token is always valued by Tether at 1 USD.



## Transparent

The value of our reserves is published daily. The value of our reserves matches or exceeds the value of all tethers in circulation.

~~110.~~111.        ~~111.~~ Only in March 2019 did Tether update its disclosure statement to state that its tokens are no longer backed 100% by U.S. dollar deposits. Tether instead claimed

27

its tokens are backed by their reserves and that those reserves included fiat currency and cash equivalents, as well as "other assets and receivables from loans made by Tether to third parties, which may include affiliated entities."

111.112.       112.To date, Tether has not undergone a professional audit, despite its representations that it would do so.

### E.       Government Investigations Confirm Defendants Misled Consumers

112.113.       113.In November 2018, the NYOAG launched an investigation into Bitfinex and Tether relating to a series of conflicted corporate transactions, which were not disclosed to investors, whereby Bitfinex took at least $700 million of Tether's cash reserves in an attempt to hide Bitfinex's massive, undisclosed losses and inability to handle customer withdrawals.

113.114.       114.In April 2019, the NYOAG obtained an injunction against further transfers of assets between and among Bitfinex and Tether. Defendants released a statement claiming that the NYOAG's court filings in obtaining the order were "written in bad faith" and were "riddled with false assertions." Defendants stated that "[b]oth Bitfinex and Tether are financially strong—full stop."

114.115.       115.Based on its investigation, the NYOAG ultimately found that Bitfinex and Tether "recklessly and unlawfully covered-up massive financial losses to keep their scheme going and protect their bottom lines" through its movement of hundreds of millions of dollars between the two companies.

115.116.       116.The NYOAG also found that Tether's numerous claims that Tether tokens were fully backed by U.S. dollars at all times was a lie. According to Attorney General Letitia James "[t]hese companies obscured the true risk investors faced and were operated by

unlicensed and unregulated individuals and entities dealing with the darkest corners of the financial system."

116.117.        117.Bitfinex and Tether entered into a settlement with the NYOAG over its illegal activity in New York on February 18, 2021, with the NYOAG finding that Defendants violated New York General Business Law § 352.

117.118.        118.The settlement requires Bitfinex and Tether to discontinue any trading activity with New Yorkers and to submit regular reports to the NYOAG to ensure compliance with this prohibition. In addition, Bitfinex and Tether are required to submit to mandatory reporting on a quarterly basis, that they are properly segregating corporate and client accounts, including segregation of government-issued and virtual currency trading accounts by company executives; as well as submit to mandatory reporting regarding transfers of assets between and among Bitfinex and Tether entities. It also requires Tether to offer categorized public disclosuresofdisclosures of the assets backing Tether tokens, including disclosures of any loans or receivables to or from affiliated entities.

118.119.        119.The settlement also requires Bitfinex and Tether to pay $18.5 million dollars in penalties to the state of New York.

119.120.        120.On October 15, 2021, the Commodity Futures Trading Commission ("CFTC") announced the simultaneous filing and settlement of charges against Tether related to its misrepresentations that Tether maintained sufficient fiat reserves to back every Tether token in circulation one-to-one with the equivalent amount of corresponding currency held in Tether reserves and that Tether would undergo routine, professional audits to demonstrate that it maintained 100% reserves at all times.

120.121.        121.The CFTC investigation revealed that from at least June 1, 2016, to

February 25, 2019, Tether failed to maintain fiat currency reserves in accounts in Tether's own

name or in an account titled and held in trust for Tether to back every Tether token in circulation.

Despite Tether's representations that it maintained adequate reserves, the CFTC found that

Tether did not at all times hold sufficient fiat reserved in Tether bank accounts to back the Tether

tokens in circulation for a substantial majority of the time period. In fact, the CFTC found that

between September 2, 2016 and November 1, 2018, "the aggregate amongamount of fiat

currency held by Tether in the Tether Bank Accounts was less than the corresponding USD[T]

tokens in circulation on 573 of 791 days." The CFTC concluded that "contrary to [Defendants']

representations, the Tether Reserves were 'full-backed' by fiat currency held in the Tether Bank

Accounts only *27.6% of the time*."

121.122.        122.Furthermore, the CFTC found during June 1, 2016, to February 25,

2019, Tether relied upon unregulated entities and third-parties to hold some of their Tether

reserve funds and commingled Tether reserves with funds belonging to Bitfinex and/or Bitfinex

customers. During this time period, Tether and Bitfinex's assets included funds held by or

received from third-parties pursuant to at least 51 different arrangements, only 22 of which were

documented through formal agreements or contracts.

122.123.        123.Moreover, the investigation found that from at least 2018 through

February 25, 2019, Tether failed to disclose that the Tether reserves were calculated including

unsecured receivables, commercial papers, funds held by third-parties, and other non-fiat assets.

The CFTC found that Tether reserves were "held in non-fiat financial products and other less-

liquid assets including commercial paper, and bank repurchase agreements. At various times . . .

[Defendants] also considered anticipated receivables and anticipated wire transfers as assets for purposes of calculating Tether Reserves."

123.124.        124.The investigation also revealed that the Tether reserves were not routinely audited despite Tether's representations otherwise. Between at least June 1, 2016, and February 25, 2019, Tether retained independent third-parties to conduct reviews of the Tether reserves only twice. The first time in 2017, Tether retained an accounting firm to review the Tether reserves against fiat currency held in Tether's name on a single date—September 15, 2017—a date selected by Tether and known ahead of the accounting firm's review and the same date Bitfinex transferred approximately $382 million to Tether's account. The second audit occurred in 2018 when Tether retained a law firm to compare its holdings in two bank accounts to the Tether tokens in circulation as of June 1, 2018, based on information provided by Tether or publicly available on the blockchain.

124.125.        125.The CFTC also concluded that Tether's method of tracking the Tether reserves did not capture the real-time status of the Tether reserves. At least until 2018, rather than employing an automated method for tracking Tether reserves against Tether tokens in circulation in real time, Tether utilized an internal, proprietary database to store data regarding Tether token issuances and redemptions and customer's transaction information which required information regarding the amount of fiat currency held as Tether reserves to be input manually. During this time, Tether's internal accounting system for tracking Tether reserves consisted of a spreadsheet, which was not always kept up to date in real time.

125.126.        126.Based on its investigation, the CFTC found that Tether violated the Commodity Exchange Act and Commission Regulations by intentionally or recklessly making untrue or misleading statements of material facts and by omitting to state material facts necessary

in order to make the statements not untrue or misleading. The CFTC found Tether's repeated representations that it would fully back the Tether token with the US dollar in accounts held in its own name, omissions regarding the actual backing of Tether tokens including non-fiat assets, representations that it would undergo regular professional audits, and omissions regarding the pre-disclosed timing of one of the two reviews it did undertake, to be untrue or misleading statements and omissions.

126.127.        127.Tether entered into a settlement with the CFTC over its untrue or misleading statements and omissions on October 15, 2021. The settlement requires Tether to cease and desist from violating the Commodity Exchange Act and Commission Regulations and to pay a civil monetary penalty of $41 million dollars.

### F.        A.Defendants Continue to Deceive Consumers

127.128. 128. Consistent with the terms of its settlement with the NYOAG, Tether Holdings Limited began making available a breakdown "of the categories of assets forming the basis of Tether's issued token reserves on March 31, 2021." It explained that it would continue to release a breakdown for the next two years.

128.129. 129.Tether's Chief Technology Officer dubbed the report "unrivaled transparency" even though it consisted of a single page.

**FIGURE 11**



129.130.        130. As represented in Figure 11, Tether considers considered 75.85% of

its reserves to be "Cash & Cash Equivalents & Other Short-Term Deposits and Commercial

Paper." A shockingly low ***3.87% of these reserves are actually cash.***

130.131.        131.On May 14, 2021, Frances Coppola, a financial commentor, explained

the analysis "confirms . . . that Tether has almost no cash dollars on its balance sheet . . . ***we now***

***know there are hardly any real dollars backing these tokens***. ***We have come a long way since***

***Tether claimed on its website that all USDT in existence were 100% backed by real US***

***dollars***."

131.132.        132.As shown in Figure 11, Tether list a whopping 65.39% of its reserves

as "commercial paper." On this, Ms. Coppola explained, "We do not know if this debt is secured

or unsecured, nor what the assets backing it are (if there are any). And we have no idea who the

borrowers are . . . The reserves are thus exposed to unknown levels of credit and liquidity risk."

She concluded, "***The 1:1 peg to the USD is therefore not remotely credible***."

~~132.~~133.        ~~133.~~To date, Defendants now have ~~69~~more than 82 billion Tether tokens in circulation. Tether's own reporting, if it is accurate, would make it "one of the largest holders of commercial paper in the world," specifically **seventh in the world**, dwarfing investments from tech giants like Google and Apple, and placing it with the likes of Charles Schwab and Vanguard Group. Its assets in general would place it in one of the 50 largest banks in the U.S., if it were not an unregulated company.

~~133.~~134.        ~~134.~~In ~~a recent~~an interview with CNBC's Deirdre Bosa, Tether's General Counsel Stuart Hoegner and Chief Technology Officer Paolo Ardoino refused to answer what Tether considers "commercial paper" or where it comes from.

~~134.~~135.        ~~135.~~Tellingly, however, "major trading desks stated to the press that **they had never worked with them or seen them in the market**." Deborah Cunningham, the Chief Investment Officer of global money markets at Federated Hermes, explained "[i]f there were a new entrant, it would be usually very obvious."

~~135.~~136.        ~~136.~~According to an investigative report by Bloomberg, one of Tether's former bankers stated that Tether tokens are "not a stablecoin" but a "high-risk offshore hedge fund" explaining that "their own banking partners don't know the extent of their holdings, or if they exist."

~~136.~~137.        ~~137.~~Bloomberg reports that billions of dollars of Tether's reserves are held in short-term loans to large Chinese companies, which money market funds typically avoid as one of the country's largest property developers has started to collapse. Tether also hold billions of dollars in loans to other crypto companies, with Bitcoin—a highly volatile cryptocurrency—as the collateral. Tether's attorneys declined to comment on whether they hold Chinese commercial

paper other than Evergrande debt. Tether's representation that it is backed 1:1 would be incorrect even if a small percentage of these loans failed.

137.138.        138. Recently, Hindenburg Research, a forensic financial research firm, announced a reward of up to $1,000,000 for additional information regarding Tether token's backing given these stark discrepancies in Tether's representations.

138.139.        139. Regarding audits, Tether's General Counsel continues to assertasserted that Tether is "working toward getting financial audits," which it haspromised— but not delivered—since 2014 for at least five years. Tether finally released a BDO report in 2022, but even that report simply confirmed that Tether had various financial instruments totaling approximately $66.4 billion—still less than the approximately $70 billion Tether tokens then in circulation.

### G.      Tether Tokens Have Repeatedly Declined in Value

139.140.        As the purpose of a stablecoin like Tether is to avoid price fluctuations, "the mere presence of price volatility for a stablecoin may be cause for concern."[6] Tether token-holders, who purchased what they believed to be a coin backed one-to-one by the U.S. dollar in order to avoid price fluctuations, have instead continuously faced price fluctuations—indeed, devaluations.

140.141.        Figure 12 reflects Tether's price fluctuations between December 2021 and August 2023. It also shows that Tether's price dropped below $1.00 numerous times during this period.

---

[6] Connor Emmert, *Tether (USDT) Cryptocurrency: Current Price and How It Works*, Nerdwallet (Jul. 29, 2022), https://www.nerdwallet.com/article/investing/tether.

**FIGURE 12[7]**



141.142.    For example, on May 7, 2022, Tether was $0.99 cents. Tether's price again dropped to $0.99 cents on June 3, June 16, June 30, July 3, July 16, and July 18, 2022 and several other dates during June and July 2022. On October 10, 2022, Tether again dropped below $1.00 to $0.99 cents.[8]

142.143.    This trend continued into late 2022 and beyond. In November 2022, reports surfaced that Tether de-pegged from the dollar after the collapse of a major cryptocurrency exchange known as "FTX." At that time Tether was trading as low as 98 cents. Less than a year later on August 14, 2023, Tether again lost its peg to the U.S. dollar and stayed below the $1.00 peg for the longest time since November 2022. As recently as August 24, 2023, Tether's price was below a dollar at $0.98 cents.

---

[7] *See* Tether USDT, CoinMarketCap, https://coinmarketcap.com/currencies/tether/historical-data/ (last accessed Aug. 25, 2023).

[8] *Id.*

143.144. These consistent price fluctuations create a substantial risk that Tether tokens will continue to devalue and cause Plaintiff and class members to trade their Tether tokens at prices lower than $1.00.

144.145. Indeed, Tether's fluctuations have led to predictions that Tether is a headed for a crash that could cost investors billions of dollars. One such prediction by the New York Times explained that as Tether continuously de-pegs from the dollar, traders question Tether's stability. "Traders might all rush to exchange their Tethers for dollars, only to discover that Tether could not fulfill those orders. Investors would lose billions of dollars.

## TOLLING OF THE STATUTE OF LIMITATIONS

145.146.   140.The applicable statutes of limitation have been tolled because of Defendants' knowing and active concealment and denial of the facts alleged herein, namely their practice of misrepresenting attributes of Tether tokens.

147.   141.As alleged in detail herein, Defendants expressly and impliedly assured consumers that Tether tokens were backed one-to-one with the U.S. dollar. Defendants knew this was false and misrepresented and concealed the nature and extent of their actions and intentions.

146.148.   142.PlaintiffsPlaintiff and Class members could not, with due diligence, have discovered the full scope of Defendants' conduct, due in no small part to Defendants' deliberate efforts to conceal such conduct. All applicable statutes of limitation also have been tolled, by operation of the discovery rule and Defendants' fraudulent concealment, at least until, the release of the NYOAG settlement on February 17, 2021.

147.149.   143.Defendants were under a duty to disclose that its misrepresentations and omissions were false but did not do so. Defendants are therefore estopped from relying on any statute of limitations.

## CLASS ACTION ALLEGATIONS

~~148.~~150.          ~~144.Plaintiffs bring~~Plaintiff brings this action pursuant to Federal Rule of

Civil Procedure 23 on behalf of himself and all others similarly situated, as representative of the

following Classes:

> **Nationwide Class:** All persons who purchased Tether tokens
> between 2014 and Present.

> **Nevada Subclass:** All residents of the State of Nevada who
> purchased Tether tokens between 2014 and Present.

~~149.~~151.          ~~145.~~Excluded from the Classes are: (1) any Judge or Magistrate presiding

over this action and any members of their families; (2) Defendants, Defendants' subsidiaries,

parents, successors, predecessors, and any entity in which Defendants or their parents have a

controlling interest and their current or former employees, officers, and directors or defendants'

co-conspirators; (3) persons who properly execute and file a timely request for exclusion from

the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits

or otherwise released; (5) ~~Plaintiffs~~Plaintiff's counsel and Defendants' counsel; and (6) the legal

representatives, successors, and assigns of any such excluded persons.

~~150.~~152.          ~~146.~~Certification of ~~Plaintiffs~~Plaintiff's claims for Class-wide treatment

are appropriate because all elements of Fed. R. Civ. P. 23(a) and (b)(2)-(3) are satisfied.

~~Plaintiffs~~Plaintiff can prove the elements of their claims on a Class-wide basis using the same

evidence as would be used to prove those elements in individual actions alleging the same

claims.

~~151.~~153.          ~~147.~~**Numerosity:** The members of the Classes are so numerous that

individual joinder of all Class members in a single action is impracticable. For instance,

according to Bloomberg, Tether has sold more than 48 billion Tether tokens in 2021. While

~~Plaintiffs are~~Plaintiff is informed and ~~believe~~believes that there are likely hundreds of thousands

(if not millions) of members of the Classes, the precise number of Class members is unknown to

~~Plaintiffs~~Plaintiff. Class members may be identified through objective means, including

Defendants' own records. Class members may be notified of the pendency of this action by

recognized, court-approved notice dissemination methods

   ~~152.~~154.  ~~148.~~**Commonality and Predominance:** There are common questions of

law and fact to the Class members, which predominate over any questions affecting only

individual Class members. These common questions of law and fact include, without limitation:

  a. Whether Defendants violated New York Gen. Bus. Law § 349 by misrepresenting and omitting the attributes of Tether tokens;

  b. Whether Defendants violated Nev. Rev. Stat. § 41.600 by misrepresenting and omitting the attributes of Tether tokens;

  c. Whether Defendants' misrepresentations and omissions regarding the attributes of Tether tokens constitute breach of express and implied contract between Defendants and ~~Plaintiffs~~Plaintiff and Class members;

  d. Whether Defendants have been unjustly enriched;

  e. Whether ~~Plaintiffs~~Plaintiff and Class members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and,

  f. Whether ~~Plaintiffs~~Plaintiff and Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

   ~~153.~~155.  ~~149.~~**Typicality:** ~~Plaintiffs~~Plaintiff's claims are typical of the claims of all

Class members because, like other Class members, ~~Plaintiffs~~Plaintiff's were harmed by

Defendants' unlawful and deceptive misrepresentations and omissions concerning Tether tokens.

   ~~154.~~156.  ~~150.~~**Adequacy of Representation:** ~~Plaintiffs are~~Plaintiff is adequate Class

representatives because they are members of the Class and their interests do not conflict with the

interests of other Class members that they seek to represent. ~~Plaintiffs are~~Plaintiff is committed

to pursuing this matter for the Class with the Class's collective best interest in mind. ~~Plaintiffs~~

~~have~~Plaintiff has retained counsel competent and experienced in complex class action litigation

of this type and ~~Plaintiffs intend~~Plaintiff intends to prosecute this action vigorously.

~~Plaintiffs~~Plaintiff and ~~their~~his counsel will fairly and adequately protect the Class's interests.

~~155.~~157.        ~~151.~~**Predominance and Superiority:** As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in ~~Plaintiffs~~Plaintiff's case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by ~~Plaintiffs~~Plaintiff and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

~~156.~~158.        ~~152.Plaintiffs reserve~~Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## <u>CLAIMS FOR RELIEF</u>

### <u>FIRST CLAIM FOR RELIEF</u>
**Violation of New York's Uniform Deceptive Trade Practices Act**
**(Gen. Bus. Law § 349, *et seq.*)**

~~157.~~159.        ~~153.Plaintiffs~~Plaintiff re-~~allege~~alleges and ~~incorporate~~incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

40

~~158.~~160.　　　　~~154.~~New York's Uniform Deceptive Trade Practice Act ("GBL § 349") prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).

~~159.~~161.　　　　~~155.~~Defendants conducted business, trade, or commerce in New York State.

~~160.~~162.　　　　~~156.~~As consumers who purchased Tether tokens, ~~Plaintiffs~~Plaintiff and Class members are "person[s]" within the meaning of GBL § 349.

~~161.~~163.　　　　~~157.~~~~Plaintiffs are~~Plaintiff is authorized to bring a private action under New York's Uniform Deceptive Trade Practices Act, Gen. Bus. Law § 349(h).

~~162.~~164.　　　　~~158.~~~~Plaintiffs~~Plaintiff and the Class purchased Tether tokens in connection with transactions in "business" "trade" or "commerce" within the meaning of GBL § 349.

~~163.~~165.　　　　~~159.~~This Count is brought for Defendants' deceptive conduct, including their unlawful and deceptive acts concerning attributes of Tether tokens, as alleged herein.

~~164.~~166.　　　　~~160.~~Defendants engaged in unlawful and deceptive acts and practices in the conduct of trade or commerce and furnishing of services purchased by ~~Plaintiffs~~Plaintiff and the Class in violation of GBL § 349, including but not limited to the following:

　　　a.　　Defendants misrepresented that Tether tokens were at all times backed one-to-one by the U.S. dollar;

　　　b.　　Defendants omitted, suppressed, and concealed Tether tokens were not at all times backed one-to-one by the U.S. dollar;

　　　c.　　Defendants engaged in deceptive, unfair, and unlawful acts by publicly denying claims that Tether tokens were not backed one-to-one by the U.S. dollar;

　　　d.　　Defendants misrepresented that they underwent routine, professional audits of their reserves;

　　　e.　　Defendants omitted, suppressed, and concealed that they did not undergo routine, professional audits of their reserves;

f.   Defendants misrepresented that Tether tokens were pegged or tied to the U.S. dollar;

g.   Defendants omitted, suppressed, and concealed that Tether tokens were not pegged or tied to the U.S. dollar; and

h.   Defendants held themselves out as having sufficient reserves while they knew that they did not.

~~165.~~167.   ~~161.~~Defendants systematically engaged in these deceptive, misleading, and unlawful acts and practices to the detriment of ~~Plaintiffs~~Plaintiff and Class members.

~~166.~~168.   ~~162.~~Defendants willfully engaged in such acts and practices and knew or acted in reckless disregard for whether they violated GBL § 349.

~~167.~~169.   ~~163.~~Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the attributes of Tether tokens and whether they were backed one-to-one by the U.S. dollar.

~~168.~~170.   ~~164.Plaintiffs~~Plaintiff and Class members relied on Defendants' deceptive representations and omissions when they paid money or other consideration in exchange for Tether tokens.

~~169.~~171.   ~~165.Plaintiffs~~Plaintiff and Class members had no way of knowing Defendants' misrepresentations were false and that Tether tokens were not backed one-to-one by the U.S. dollar, as only Defendants had exclusive knowledge of their internal business practices and cash reserves.

~~170.~~172.   ~~166.Plaintiffs~~Plaintiff and Class members have been injured as a direct and proximate result of Defendants' violations as they would not have purchased, or would have paid significantly less for, Tether tokens had they known these statements were false and of Defendants' omissions.

~~171.~~173.        ~~167.~~The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

~~172.~~174.        ~~168.Plaintiffs~~Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per class member, whichever is greater, treble damages, injunctive relief, and attorneys' fees and costs.

### SECOND CLAIM FOR RELIEF
**Nevada Deceptive Trade Practices Act**
**(Nev. Rev. Stat. § 41.600, *et seq.*)**
**(on behalf of the Nevada Subclass)**

~~173.~~175.        ~~169.Plaintiffs~~Plaintiff re-~~allege~~alleges and ~~incorporate~~incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

~~174.~~176.        ~~170.~~The Nevada Deceptive Trade Practices Act ("NDTPA") authorizes a private right of action on behalf of "any person who is the victim of consumer fraud. N.R.S. § 41.600(1).

~~175.~~177.        ~~171.~~"Consumer fraud" is defined as any "deceptive practice" as defined in N.R.S. § 598.0915. Defendants engaged in a "deceptive practice" in the course of their business in violation of § 598.0915(2), (5), (7), (9), and (15). Specifically, Defendants:

a.  Defendants misrepresented that Tether tokens were at all times backed one-to-one by the U.S. dollar;

b.  Defendants omitted, suppressed, and concealed Tether tokens were not at all times backed one-to-one by the U.S. dollar;

c.  Defendants engaged in deceptive, unfair, and unlawful acts by publicly denying claims that Tether tokens were not backed one-to-one by the U.S. dollar;

d.  Defendants misrepresented that they underwent routine, professional audits of their reserves;

e. Defendants omitted, suppressed, and concealed that they did not undergo routine, professional audits of their reserves;

f. Defendants misrepresented that Tether tokens were pegged or tied to the U.S. dollar;

g. Defendants omitted, suppressed, and concealed that Tether tokens were not pegged or tied to the U.S. dollar; and

h. Defendants held themselves out as having sufficient reserves while they knew that they did not.

176.178.         172.Defendants had a duty to disclose these material facts but did not do so. Defendants had a duty to disclose because: (a) they were aware of their own reserves and audit procedures; (b) they had exclusive knowledge of its reserves and audit procedures; (c) they actively concealed material facts concerning Tether tokens, their reserves, and their audits (or lack thereof) from the general public, PlaintiffsPlaintiff, and the Nevada Subclass members. As detailed above, the information concerning Tether tokens was known to Defendants at all times, but they actively concealed these facts by representing otherwise and producing unreliable, misleading "reviews" of their reserves.

177.179.         173.Defendants intended for PlaintiffsPlaintiff and Subclass members to rely on it to provide adequate information regarding Tether tokens and rely on these misrepresentations and omissions in purchasing Tether tokens.

178.180.         174.Defendants intentionally and knowingly failed or refused to disclose accurate information regarding Tether tokens, their reserves, and their audits.

179.181.         175.PlaintiffsPlaintiff and Class members relied on these misrepresentations and omissions in purchasing Tether tokens. PlaintiffsPlaintiff and Class members were would not have purchased Tether tokens, or would have paid substantially less, if not for these misrepresentations and omissions.

180.182.          176.Plaintiffs Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including damages, equitable relief that the court deems appropriate, and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF
**(Breach of Contract)**
**(Against All Defendants)**

181.183.          177.Plaintiffs incorporate Plaintiff incorporates by reference and re-allege the preceding allegations, as though fully set forth herein.

182.184.          178.As described herein, Defendants expressly promised time and time again that Tether tokens were backed one-to-one by the U.S. dollar in sufficient reserves.

183.185.          179.Defendants expressly promised that Tether tokens are a "stablecoin" "100% backed by Tether's reserves" "pegged to dollars" and that "[t]he conversion rate is 1 Tether USDT token (USDT) equals 1 USD."

184.186.          180.Defendants also expressly promised to undergo routine, professional audits of their reserves.

185.187.          181.Defendants also marketed their reserves and purported transparency as one of the reasons why customers should purchase Tether tokens. For example, Tether's website advertises that "Tether's platform is built to be transparent at all times."

186.188.          182.Plaintiffs Plaintiff and Class members fully performed their obligations under their contracts with Defendants, including by purchasing or providing other consideration for Tether tokens.

187.189.          183.Defendants did not hold up their end of the bargain. In entering into such contracts, Defendants agreed to maintain in reserves the same amount of U.S. dollars as

issued Tether tokens; that Tether tokens would be pegged or tied to the U.S. dollar; and that they would undergo routine, professional audits of their reserves.

~~188.~~190.        ~~184.~~Defendants failed on all accounts: (1) Defendants did not maintain in reserves the same amount of U.S. dollars as issued Tether tokens; (2) Defendants did not maintain sufficient reserves, regardless of in U.S. dollars, to "fully back" Tether tokens; (3) Tether tokens are not pegged or tied to U.S. dollars; and (4) Defendants did not undergo routine, professional audits.

~~189.~~191.        ~~185.~~Each of these separate acts constitutes a breach of the contracts Defendants entered with ~~Plaintiffs~~Plaintiff and Class members.

~~190.~~192.        ~~186.~~~~Plaintiffs~~Plaintiff and Class members have been damages as a direct and proximate result of Defendants' breach of contract. ~~Plaintiffs~~Plaintiff and Class members would not have purchased, or would have paid significantly less, for Tether tokens had they known these representations were false.

~~191.~~193.        ~~187.~~~~Plaintiffs~~Plaintiff and Class members are entitled to compensatory and consequential damages as a result of Defendants' breach of contract. ~~Plaintiffs~~Plaintiff and Class members seek damages in an amount to be determined at trial, plus interest.

### FOURTH CLAIM FOR RELIEF
**(Breach of Implied Contract)**
**(Against All Defendants)**

~~192.~~194.        ~~188.~~~~Plaintiffs incorporate~~Plaintiff incorporates by reference and re-allege the preceding allegations, as though fully set forth herein.

~~193.~~195.        ~~189.~~~~Plaintiffs plead~~Plaintiff pleads this claim in the alternative to the Second Claim for Relief of Breach of Contract alleged above.

194.196.         190.Defendants solicited and invited prospective customers such as PlaintiffsPlaintiff and Class members to purchase Tether tokens based on their representations that: (1) they maintained sufficient reserves in the same amount of U.S. dollars as issued Tether tokens; (2) that Tether tokens were fully backed by sufficient reserves, regardless of form; (3) that Tether tokens were pegged or tied to U.S. dollars; and (4) that Defendants would be transparent, undergoing routine, professional audits of its reserves.

195.197.         191.PlaintiffsPlaintiff and Class members accepted Defendants' offer and paid money or other consideration to purchase Tether tokens.

196.198.         192.When PlaintiffsPlaintiff and Class paid money or other consideration in exchange for Tether tokens, they entered into implied contracts with Defendants pursuant to which Defendants agreed to (1) maintain sufficient reserves to back Tether tokens one-to-one with the U.S. dollar; (2) fully back Tether tokens with sufficient reserves; (3) peg or tie Tether tokens to the U.S. dollar; and (4) undergo routine, professional audits of its reserves and maintain transparency.

197.199.         193.In entering into such implied contracts, PlaintiffsPlaintiff and Class members reasonably believed that Defendants would live up to these promises and would use the funds received from PlaintiffsPlaintiff and Class members to do so.

198.200.         194.PlaintiffsPlaintiff and Class members would not have paid for or would have paid less for Tether tokens in the absence of the implied contract between them and Defendants.

199.201.         195.PlaintiffsPlaintiff and Class members fully performed their obligations under the implied contracts with Defendants, including paying money or other consideration.

47

202.    196.Defendants breached their implied contract with ~~Plaintiffs~~Plaintiff and Class members by failing to maintain sufficient reserves to back Tether tokens one-to-one with the U.S. dollar; not maintaining sufficient reserves, regardless of in U.S. dollars, to fully back Tether tokens; not

tying Tether tokens to U.S. dollars; and not undergoing routine, professional audits.

~~200.~~203.    197.~~Plaintiffs~~Plaintiff and Class members would not have purchased Tether tokens in the absence of the implied contracts between them and Defendants, obligating Defendants to maintain the same number of U.S. dollars in reserves as Tether tokens in circulation.

~~201.~~204.    198.~~Plaintiffs~~Plaintiff and Class members have been damaged as a direct and proximate result of Defendants' breach of implied contract. ~~Plaintiffs~~Plaintiff and Class members would not have purchased, or would have paid significantly less, for Tether tokens had they known these representations were false.

~~202.~~205.    199.~~Plaintiffs~~Plaintiff and Class members are entitled to compensatory and consequential damages as a result of Defendants' breach of contract. ~~Plaintiffs~~Plaintiff and Class members seek damages in an amount to be determined at trial, plus interest.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Under New York Law)

~~203.~~206.    200.~~Plaintiffs~~Plaintiff re-~~allege~~alleges and ~~incorporate~~incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

~~204.~~207.    201.~~Plaintiffs plead~~Plaintiff pleads this claim in the alternative to the Second Claim for Relief of Breach of Contract and Third Claim for Relief of Breach of Implied Contract, alleged above.

205.208.          202.Absent Defendants' misrepresentations and omissions concerning their reserves and the attributes of Tether tokens, Defendants would have had to charge less for Tether tokens.

206.209.          203.As such, ~~Plaintiffs~~Plaintiff and other members of the Class conferred an improper benefit upon Defendants, which Defendants were aware of and have unjustly retained. This includes ill-gotten profits and revenues from purchases of Tether tokens, among other things, resulting from Defendants' misrepresentations and omissions.

207.210.          204.As a direct and proximate result of Defendants' unjust enrichment, under principles of equity and good conscience, ~~Plaintiffs~~Plaintiff and the Class are entitled to full disgorgement and restitution of all amounts by which Defendants were enriched through their unlawful or wrongful conduct.

### SIXTH CLAIM FOR RELIEF
**Declaratory and Injunctive Relief**
**(Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*)**

208.211.          205.~~Plaintiffs~~Plaintiff re-~~allege~~alleges and ~~incorporate~~incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

209.212.          206.Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

210.213.          207.An actual controversy has arisen regarding the lawfulness of Defendants' misrepresentations and omissions, including that Tether tokens are backed one-to-one by the U.S. dollar.

211.214.       208.Plaintiffs Plaintiff and Class members continue to suffer injury as a result of Defendants' misrepresentations and omissions, including that Class members will continue to be deceived by these misrepresentations and omissions such that they will continue to purchase Tether tokens in the future.

212.215.       209.Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendants must either cease and desist from misrepresenting its reserves and the attributes of Tether tokens and correct its prior misstatements.

213.216.       210.The Court also should issue corresponding prospective injunctive relief requiring Defendants to immediately disclose to all purchasers of Tether tokens that their reserves do not consist of U.S. dollars and that Tether tokens are not backed one-to-one by the U.S. dollar.

214.217.       211. If an injunction is not issued, Plaintiffs Plaintiff and Class members will suffer irreparable injury for which they lack an adequate legal remedy. If Defendants continue misrepresent their reserves and the attributes of Tether tokens, Plaintiffs Plaintiff and Class members will not have an adequate remedy at law, because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

215.218.       212.The hardship to Plaintiffs Plaintiff and Class members if an injunction does not issue greatly exceeds the hardship to Defendants if an injunction is issued. Defendants' failure to maintain sufficient reserves in U.S. dollars constitutes a breach of the contractual promises between Plaintiffs Plaintiff and Class members. It also constitutes a deceptive trade practice under N.Y. law harming consumers, such as Plaintiffs Plaintiff and Class members. On the other hand, the cost to Defendants in complying with an injunction by disclosing the truth about its reserves and Tether tokens is minimal.

~~216.~~219.        ~~213.~~Issuance of the requested injunction will serve the public interest by preventing further purchases of Tether tokens based on Defendants' misrepresentations and omissions, thus eliminating the additional injuries that would result to consumers who will continue to purchase Tether tokens based on false pretenses.

220.    ~~214.~~Accordingly, ~~Plaintiffs~~Plaintiff and the Class are entitled to an order enjoining Defendants from engaging in the unlawful conduct alleged in this complaint, requiring Defendants to immediately disclose to all purchasers of Tether tokens that their reserves do not consist of U.S. dollars and that Tether tokens are not backed one-to-one by the U.S. dollar, and other appropriate equitable relief.

~~217.~~221.        ~~215.~~~~Plaintiffs~~Plaintiff also seek such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, ~~Plaintiffs~~Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

a. Certify the Class pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and order that notice be provided to all Class members;

b. Designate ~~Plaintiffs~~Plaintiff as ~~representatives~~representative of the Class and the undersigned counsel, LOWEY DANNENBERG, P.C. as Class Counsel;

c. Award ~~Plaintiffs~~Plaintiff and the Class actual damages, compensatory damages, and statutory damages in an amount to be determined by the Court and treble and punitive damages to punish Defendants' egregious conduct as described herein, and to deter Defendants and others from engaging in similar conduct;

d. Award ~~Plaintiffs~~Plaintiff and the Class injunctive relief, as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices set forth herein, ordering Defendants to fully disclose the extent and nature of the security breach and theft, and ordering Defendants to pay for identity theft and credit monitoring services for ~~Plaintiffs~~Plaintiff and the Class;

e. Award ~~Plaintiffs~~Plaintiff and the Class statutory interest and penalties;

51

f. Award ~~Plaintiffs~~Plaintiff and the Class their costs, prejudgment and post judgment interest, and attorneys' fees; and

g. Grant such other relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

~~Plaintiffs~~Plaintiff hereby ~~demand~~demands a trial by jury as to all issues stated herein, and all issues so triable.

Dated: ~~December 10, 2021~~August 25, 2023~~1~~          Respectfully submitted,
      White Plains, New York

                                               **LOWEY DANNENBERG P.C.**

                                             /s/ Christian Levis
                                             Christian Levis
                                             Noelle ~~Feigenbaum~~Forde
                                             Amanda Fiorilla
                                             44 South Broadway, Suite 1100
                                             White Plains, NY 10601
                                             Tel.: (914) 997-0500
                                             Fax: (914) 997-0035
                                             Email: clevis@lowey.com
                                                  ~~nfeigenbaum~~nforde@lowey.com
                                                  afiorilla@lowey.com

                                             *Attorneys for ~~Plaintiffs~~Plaintiff and the  Proposed Class*